Daniel Lee **JACKSON** et al.

v.

**William DOBBS** et al.

**Civ. A. No. 13702.**

United States District Court,
N. D. Georgia,
Atlanta Division.

May 22, 1970.

288

Moore & Rindskopf, Atlanta, Ga., for plaintiffs.

Gambrell, Russell, Killorin, Wade & Forbes, Atlanta, Ga., for defendants.

## ORDER

ALBERT J. HENDERSON, Jr., District Judge.

Plaintiffs, Negro citizens residing in Covington, Georgia, brought this action to attack the parade permit ordinance of the City of Covington. § 20–11 of the City Code of the City of Covington, Georgia, titled "Parades, Demonstrations, Assemblies and Picketing". They alleged that the requirement in the ordinance that they obtain a permit before 4:00 P.M. on the day prior to the activity, i. e., parade, demonstration, assembly, or picket line, was a prior restraint on their right to free speech and assembly, as granted by the First Amendment. They sought temporary and permanent injunctive relief, alleging irreparable injury if such relief were not granted, in that the constitutional rights of the class were being "chilled" by the ordinance and would continue to be if relief were not granted.

On Saturday, May 16, 1970, a hearing was held in the case, with evidence presented by both sides. At the hearing, testimony was given on behalf of the plaintiffs by Richard Johnson and Daisy Smith. Mr. Johnson testified that there was a civil rights movement in Covington entitled The Black United Front. This organization generally meets in the evenings, after working hours, at the St. Paul A.M.E. Church. After the mass civil rights meeting, it was the habit of the group to march through the City of Covington, the downtown area being only a few blocks

away, and return to the church. The permit ordinance had not been enforced prior to about March 14, 1970. Prior to that time, many parades and demonstrations had been held without the obtaining of a permit. However, on or about March 12, 1970, the marchers were met one evening by officials of the City of Covington, who informed them that thereafter, the parade permit ordinance would be enforced, and that they would be required to obtain a permit for each march or demonstration. Subsequent to this warning, arrests were made on two occasions. On the first occasion, about April 1, 1970, marchers had not obtained a permit. The sole reason for the arrest was the failure to obtain a permit, there being no evidence that the marchers were breaching the peace or committing any other offense at the time. As a result of these arrests, cases were made in the City Court of Covington against the marchers, many pleading guilty, some pleading not guilty, and some merely forfeiting bond. All either were fined or forfeited bond. On the other occasion on which arrests had been made, about April 14, 1970, they were made because the march was being held outside the time allowed during the permit. It later appeared that the time for which the permit had been applied for had been changed by city officials. Because the time change appeared on page 2 of the permit, the change had gone unnoted by the demonstrators or persons parading. As a result, city officials, after keeping some 200 marchers in the city jail overnight, released all of these persons and dismissed all of the charges against them.

There was some evidence of harassment of the marchers during the marches by the police. For example, Miss Smith testified that police cars would drive alongside the marchers with the siren blowing, for no apparent reason. On one occasion, policemen stood in the path of the marchers, not speaking and not impeding their path, other than requiring each marcher to step around the policeman directly in his path. On the

occasion of the arrest of the marchers for marching outside of the permitted time, Miss Smith testified that the heat in the jail had been turned up, to the point of extreme discomfort for those incarcerated.

Johnson complained that the march routes had been restricted. For example, the marchers were permitted to circle the city square only once, and in a counterclockwise direction. Then, they were permitted to assemble in the downtown city park for a few minutes, before they marched back to the church. Occasionally, changes were made in the routes for the marches. Invariably, the marchers would go to the downtown area from the church in the evenings. Despite all this, Johnson stated that no parade, picketing, demonstration or assembly permit had ever been denied.

City Manager Frank Turner also testified. Turner had administrative responsibility for all departments of the city, including police and fire departments. Although Johnson had complained that permits were granted for the "downtown" area, meaning a distance of one block from the city square in all directions, this not including several business establishments in the downtown area, Turner testified that several permits had been granted for picketing at specific business locations outside the "downtown" parade or picketing area. Further, Turner testified that about a dozen arrests for disorderly conduct of whites, heckling the marchers in the area of the city square, had been made.

Turner testified, in essence, that it was the desire of the city to have notice of the parades before they were to occur. During the middle part of March, there had been two "port and starboard" shifts of police duty, 12 hours each. However, in April, 1970, and later, the city had 26 police, which operated on three shifts. A police chief was on duty from 8:00 to 4:00 during the daylight hours, and an assistant chief on from 4:00 to 12:00 in the evenings. The city

had a population of approximately 12,-000. Turner's fear, as city manager, was that the marchers might be struck by a fire truck hurrying to a fire if notice were not granted the city sufficiently in advance to be aware of the route which the marchers were taking. No discretion was exercised in the granting of permits, which always had been granted and never had been denied. Areas included the downtown area, and specific business outside the downtown area, including a shopping center at the intersection of the interstate highway. Occasionally, the city had utilized the notice given to it by the marchers by holding traffic in some locations for them. It had no interest in the message given by the marchers, but only sought notice of the marches in order to more effectively allocate the limited resources of the fire and police departments to more effectively provide for the public safety.

The time for which a permit had been sought had been changed on only two occasions. Once, about April 14, 1970, the chief of police had advised the city manager that the time requested, from 9:00 to 10:00, be changed to 8:00 to 9:00 P. M. This change was made. It was on this occasion that the marchers were arrested and, on subsequent realization of the misunderstanding which had occurred, were released without charges being brought against them. On another occasion, a Sunday night time had been changed to avoid conflict with church services in several churches near the square on the march route, which were to be holding church services during the period of the march. As previously stated, every permit which had ever been applied for in the City of Covington had been granted. This included Boy Scouts, P.T.A., Ku Klux Klan, labor unions, and a whole gamut of activity. While plaintiffs complained that some activities had been given two week permits, there was no evidence that plaintiffs had ever been denied a two week permit, or had even applied for a two week permit. On one occasion, before the

time of City Manager Turner, the George C. Wallace for President Campaign had been granted a two month permit for the campaign, on September 28, 1968. In addition, certain labor organizations had been granted organizational campaign permits at local manufacturing plants of three and six months duration.

Initially, the question is stated whether the ordinance is an impermissible "prior restraint" on the First Amendment freedoms of the plaintiffs.

■ As a threshold proposition, the court recognizes that the City of Covington is entitled, within the limits of equal enforcement of the the laws, to establish some means of control over its public highways and the traffic thereon.

Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend. The control of travel on the streets of cities is the most familiar illustration of this recognition of social need. Where a restriction of the use of highways in that relation is designed to promote the public convenience in the interest of all, it cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection. One would not be justified in ignoring the familiar red traffic light because he thought it his religious duty to disobey the municipal command or sought by that means to direct public attention to an announcement of his opinions. As regulation of the use of the streets for parades and processions is a traditional exercise of control by local govern-

ment, *the question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places.* (emphasis added).

Cox v. New Hampshire, 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 1052 (1941). As primary authority for their motion for injunctive relief, plaintiffs cite the case of Robinson v. Coopwood, 292 F.Supp. 926 (N.D.Miss.1968) aff'd, 415 F.2d 1377 (5th Cir. 1969) (per curiam). The facts giving rise to the *Robinson* case arose in Holly Springs, Mississippi, in the spring of 1968. Two days after the April 4, 1968, murder of the Rev. Dr. Martin Luther King some 30 miles away from Holly Springs, in Memphis, Tennessee, there was conducted a march of some 500 people, which began on the campus of Rust College in Holly Springs and proceeded into the downtown area of Holly Springs. Between April 6, 1968, the date of the first march, and May 10, 1968, a series of marches were held, in which the marchers sought to demonstrate to the community of Holly Springs certain grievances held by the Negro population. On May 10, 1968, the board of aldermen of the City of Holly Springs passed unanimously an ordinance regulating peaceful demonstrations within the city limits. One of the provisions of the ordinance was that a permit be obtained one hour before the activity. After the passage of this ordinance, warning was given a group of demonstrators on May 12, or 13, and, on May 15, 1968, numerous arrests were made. On none of the occasions occurring subsequent to the enactment of the ordinance were permits obtained, in accordance with it. In discussing the circumstances surrounding the case, Chief Judge Keady adverted to the fact that the demonstrations prior to the enactment of the ordinance had been peaceful and non-violent. In holding that the ordinance was an unconstitu-

tional "prior restraint" on the plaintiffs' First Amendment freedoms, he recognized that unrest which had followed the death of Dr. King had subsided, " \* \* \* largely as a result of the ability of the Negroes to vent their grievances through peaceful public protests." 292 F.Supp. at 930. The complaints of the plaintiffs in the *Robinson* case focused on the requirement that one hour's notice be given the City of Holly Springs prior to any marches or demonstrations. As in this case, the infractions of the ordinance for which the plaintiffs were arrested in *Robinson* were of a technical nature only. However, from the time of the initial arrests in the *Robinson* case, the facts there and in this case are sharply divergent, because, after those arrests, there were no further marches or demonstrations by Negro citizens. The court in the *Robinson* case found that enforcement of the ordinance had a "stifling" effect upon the exercise of the constitutional rights of free speech and assembly of the marchers. In this case, however, this court finds that there has been no such stifling or "chilling" effect on peaceful marches, demonstrations, assemblies, or picketing, within or surrounding the City of Covington. Indeed, during the period from April 1, 1970, to the time of filing of the defendant's answer, May 14, 1970, approximately 50 permits had been granted to persons allegedly within the class of plaintiffs. As stated, the only arrests made have been for failure to have a permit, and for parading outside the hours allowed by the permit. On the latter basis, no charges were made. On these occasions, the arrests were of all marchers, contrary to the facts in the *Robinson* case, in which an antidemonstration animus were indicated by the arrest of only leaders of the march, as well as prominent local Negro leaders who were not actual participants in the march. In *Robinson,* the court stated:

> It would seem that the city officials, in enacting, enforcing, and prosecuting under this ordinance, were moti-vated primarily by a desire to impede and, if possible, totally halt all organized civil rights marches within the corporate limits.

292 F.2d 934. Based on all the evidence, the court finds that such an anti-civil rights activity animus is not present among the officials in the City of Covington.

Plaintiffs point to the affirmance of the *Robinson* case by the Fifth Circuit. However, that affirmance was stated cryptically in only two sentences, in pertinent part, as follows:

> Under the particular facts and circumstances of this case, this Court has reached the conclusion that the judgment of the district court should not be reversed.

415 F.2d at 1377. In this connection, it was stated by the Fifth Circuit:

> Lastly, no Federal Court has the authority to interfere with any municipality in the promulgation and lawful enforcement of reasonable regulations for maintaining the safety and convenience of all citizens in the orderly use of its public streets and sidewalks, so long as these regulations comply with Constitutional standards.

Guyot v. Pierce, 372 F.2d 658, 661 (5th Cir. 1967) (citing Cox v. New Hampshire, *supra*). Compare Guyot v. Pierce, *supra*, which struck down a parade permit ordinance for lack of constitutional standards contained within the ordinance, although recognizing the subject matter with which the ordinance dealt was a legitimate municipal concern, with Hamer v. Musselwhite, 376 F.2d 479 (5th Cir. 1967), which upheld a parade ordinance prohibiting parades on four streets surrounding the courthouse square in Lexington, Mississippi. In dicta, the Supreme Court of the United States recently has impliedly approved the use of parade permits so long as the permission required is not at the discretion of local officials. *See* Cox v. Louisiana, 379 U.S. 536, 556, 85 S.Ct. 453, 13 L.Ed.2d 471, 485 (1965), particularly note 15. Even more recently, the Su-

preme Court has generally approved the requirement that a parade permit may be secured in order that municipal authorities " \* \* \* be able to limit the amount of interference with use of the sidewalks by other members of the public by regulating the time, place, and manner of the parade." Amalgamated Food Employees v. Logan Valley Plaza, Inc., 391 U.S. 308, 320–321, 88 S.Ct. 1601, 1610, 20 L.Ed.2d 603, 613 (1968) (and cases therein cited).

■ In summary, the court believes that the municipal authorities of the City of Covington, Georgia, have a legitimate municipal concern in the use of the streets and highways of Covington. Moreover, the court believes and holds that this parade permit ordinance is a reasonable means of accomplishing these ends. In other words, the needs of the municipal authorities for notice of the time at which a parade, march, demonstration, assembly, or picketing, is to take place, in order to protect the general public, including those participating in such an activity, overbalances the inconvenience to plaintiffs of foreseeing the activity and applying for a permit by 4:00 P.M. on the day before the activity. Finally, and most important, the court finds a legitimate, bona fide concern in the general public safety; the court does not find an anti-civil rights activity animus on the part of the municipal authorities of the City of Covington. This is not to say that there have not been incidents which demonstrate that there is friction between the white and black citizens of Covington. However, this friction is an outgrowth of the same conditions which the plaintiffs, by their civil rights activities, allegedly seek to ameliorate. For this reason, Covington's municipal authorities must exercise great care in the enforce-

ment of provisions such as the ordinance at hand, in order that the constitutional rights of its citizens, both white and black can be asserted without fear of punishment.[1]

Further, plaintiffs claim that the ordinance is enforced in such a way that the applicant for the permit must be present at all times during the activity to be carried on. Because all of the members of the class allegedly are working people, this creates a hardship on those who are applicants for permits. While the court does not find as fact that this is the practice in Covington it notes that such a practice, if enforced, would be totally unrelated to the notice function which the defendants claim the parade permit serves.

Therefore, the plaintiffs' motion for temporary and preliminary injunction is denied.

---

[1]. In this connection, although this particular portion of the ordinance is uncontested in this action, the court notes that an "assembly" within the meaning of this ordinance, is defined as a "crowd of more than four (4) persons standing, congregated or assembled" on any street or sidewalk in the city. Under this definition of the word "assembly" a conversation on a sidewalk of five persons arguably would make each of one of them liable for arrest as violating the ordinance. While there has been no suggestion to the court that the ordinance might be applied in such a fashion, the provision is of questionable constitutionality on its face.